IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
U.S. Magistrate Judge S. Kato Crews

Civil Action No. 1:16-cv-02969-SKC

MICHELE ST. MICHAEL,

 Plaintiff,

v.

ROCKY MOUNTAIN FESTIVALS, INC.,

 Defendant.

---

**ORDER PARTIALLY GRANTING AND PARTIALLY DENYING
MOTION FOR SUMMARY JUDGMENT [ECF. #142]**

---

This Order addresses Defendant's Motion for Summary Judgment ("Motion") on all remaining claims. The Court has reviewed the Motion, the Response, the Reply, and the exhibits attached to those filings. [ECF. #143, #146, #147, #152, #153.] Oral argument will not materially assist the Court's resolution.[1] The Court PARTIALLY GRANTS and PARTIALLY DENIES the Motion for the reasons explained below.

### A. JURISDICTION

The Court has jurisdiction over this case under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction).

---

[1] The issues raised by the Motion are fully briefed, obviating the need for an evidentiary hearing or oral argument. The Motion stands submitted on the papers. *Cf.* Fed. R. Civ. P. 56(a); *Geear v. Boulder Cmty. Hosp.*, 844 F.2d 764, 766 (10th Cir.1988) (any hearing requirement for summary judgment motions is satisfied by the court's review of the briefs and supporting materials submitted by parties).

## B. BACKGROUND FACTS

The undisputed material facts are as follows, unless otherwise noted: Plaintiff reads tarot cards at local renaissance festivals around the country. She worked as a tarot card reader at the Colorado Renaissance Festival ("Festival") for over 30 years, from the early 1980's through 2016. Defendant owns and operates the Festival sixteen days over eight weekends each summer in Larkspur, Colorado. The Festival brings together various artists, entertainers, crafts, and food purveyors to create a realistic Renaissance-era marketplace for its patrons, complete with King Henry, Queen Anne, and a kingdom called Larkspurshire. The goal is to create a "living, breathing, believable Festival atmosphere at all times," and to "delight each and every patron that enters [the] Kingdom."

To work at the Festival, each season Plaintiff signed a space lease agreement with Defendant. The agreement at issue in this case is the 2015 Space Lease Agreement signed by the Parties on April 10, 2015.[2] Plaintiff signed the Space Lease Agreement to engage in palmistry and tarot card reading at the Festival. The agreement allowed her to build a booth on Festival grounds from which she could provide her services on specific days during the 2015 season. The season ran from June 13 to August 2, 2015. When working at the Festival, Plaintiff charged patrons of her booth a fee for her services. On average, she charged $20–$25 ($10 for children) during the years 2013, 2014, and 2015. Her revenue in each of those years did not exceed $8,000.

---

[2] The 2015 Space Lease Agreement is materially identical to prior space lease agreements between the Parties.

Defendant paid no salary, hourly wage, or other direct compensation to Plaintiff. The Space Lease Agreement required Plaintiff to pay Defendant rent to lease a portion of land for locating and operating her booth. In addition to paying rent, the Space Lease Agreement obligated Plaintiff to pay for the electricity used at her booth, provide her own insurance, and report her revenues to applicable governmental agencies for federal and state tax-related purposes. The agreement also contained a provision titled "Independent Contractor Status," where Plaintiff acknowledged (among other things) she was not an employee of Defendant.

The Space Lease Agreement also contained a provision requiring Plaintiff to follow Defendant's Rules and Regulations of the Realm ("Rules"). That provision specified that the Rules were "intended to govern the conduct of the Exhibitor and its Staff on the Festival Site . . . on Festival days and throughout the Festival season."[3] The Rules are extensive. Pertinent to Plaintiff, they governed: the specific hours her booth needed to be staffed during Festival days; when and whether she could close her booth due to inclement weather and provided a $100 fine if she closed it without Defendant's permission; her costume, which Defendant needed to approve in advance; her manner of speech, decorum and performance; the style or coloring of her hair and covering of tattoos or body piercings; the goods or services she could sell; the equipment she could use or have present at her booth; any changes to her booth, which required advance approval; how she could be disciplined for violating the Rules; what advertising she could

---

[3] The Rules and Space Lease Agreement use the terms "Exhibitor" and "Crafter," which appear to be synonymous—both identified Plaintiff's role with the Festival.

3

do for her booth, if any; the identification with an "employee number" to be worn by her at all times during the Festival; and, to whom among Defendant's management personnel Plaintiff should direct her questions about the Festival.

This case arose because Defendant did not invite Plaintiff back for the 2016 season. Plaintiff claims this was in retaliation for her prior complaint of sexual harassment. According to Plaintiff, in 2013, David Walker ("Walker"), Defendant's Site Manager, sexually harassed her on a single occasion by confiscating her entrance pass and telling her he would return it if she performed oral sex on him. Plaintiff rejected this advance, complained about it to Defendant's Crafts Coordinator, and later got her entrance pass back. Plaintiff alleges Defendant did not invite her back for the 2016 season in retaliation for her sexual harassment complaint involving Walker, and further that Walker lobbied Defendant not to invite her back because of her prior complaint.

Jim Paradise, Sr. ("Paradise"), is Defendant's sole shareholder. Absent a writing to the contrary, he is the sole person authorized to act for Defendant. The Space Lease Agreement provides that Plaintiff could not rely upon oral statements from others associated with the Festival due to Paradise's sole authority to speak for and bind Defendant.

According to Paradise, when an existing Exhibitor is granted or offered a lease for the next season, space leases are sent out in March or April the following year.[4] But he also sometimes allows people to sign leases as late as June of the applicable season.

---

[4] For example, when the 2015 season ended, leases for the 2016 season were sent in March/April 2016 for the season beginning in June 2016.

4

The latter could happen "with people who have been around and we know that they're important to the festival." Thus, the fact that a previous Exhibitor does not have a lease signed until right before the season starts does not mean they could not participate in the Festival because there are times when Paradise makes last-minute deals.

During her numerous years working at the Festival, Plaintiff never received any written complaints about her booth, her appearance, her interactions with patrons, or anything else. Her personality did not change in any meaningful way over the years. At some point, after either realizing or being told (by someone other than Paradise) that she was not going to be asked back for the 2016 season, Plaintiff wrote to Paradise on December 1, 2015. In her letter, she wrote "to inquire about my renewal," offered to relocate or differently theme her booth, and asked Paradise to call or write her in response.

The record is not clear on whether Paradise received Plaintiff's December 1, 2015 letter. Nevertheless, it is undisputed that Paradise subsequently sent Plaintiff a written notice dated January 18, 2016, asking Plaintiff to remove her booth. Paradise sent the notice to a Hawaii address Plaintiff identified for herself in the Space Lease Agreement. Ultimately, Plaintiff never received the notice—it was returned to Paradise unopened and marked undeliverable. Defendant subsequently removed Plaintiff's booth. Plaintiff claims she did not know or understand that Defendant had terminated their relationship until March 7, 2016, when Defendant's Crafts Coordinator told her that Defendant would not relocate her booth.

Defendant claims it removed Plaintiff's booth based on a provision of the Space Lease Agreement which provided, in relevant part, that: (1) Exhibitors could only construct temporary structures on the leased space; (2) in the event of termination of the agreement, all structures constructed on or then existing on the leased space would be considered personal property; and, (3) "if any personal property remains on the Leased Space for a period of six months after the end of the term of this lease, then such personal property shall be automatically assigned to and become the property of [Defendant], and may, at the [Defendant's] option, be removed . . . ." Regarding this latter provision, the Space Lease Agreement is for a specified term running from 1:00 p.m. the day before the commencement of the Festival Period, to 1:00 p.m. the day following the end of the Festival Period. The Festival Period began on June 13, 2015, and ended on August 2, 2015. Thus, the term of the Space Lease Agreement was from 1:00 p.m. on June 12, 2015, to 1:00 p.m. on August 3, 2015. It is undisputed that Defendant removed Plaintiff's booth sometime after February 3, 2016, which was over six months after the end of the 2015 Festival season.

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on August 2, 2016. In her charge of discrimination, she stated she had "subcontracted as a Tarot Card Reader" with the Festival since 1980. When she signed her charge of discrimination, she "declare[d] under penalty of perjury" that the information in her charge of discrimination was "true and correct." [ECF. #143-2.] Plaintiff's remaining claims in this action include: unlawful retaliation in violation of Title

VII of the Civil Rights Act of 1964; breach of contract; and, breach of implied covenant of good faith and fair dealing.

### C. STANDARD OF REVIEW

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if the issue could be resolved in favor of either party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir. 1994). A fact is "material" if it might reasonably affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Farthing*, 39 F.3d at 1134.

A party who does not have the burden of proof at trial must show the absence of a genuine issue of fact. *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994), *cert. denied* 514 U.S. 1004 (1995). Once the motion has been properly supported, the burden shifts to the nonmovant to show by tendering depositions, affidavits, and other competent evidence that summary judgment is not proper. *Id.*, at 1518. All evidence must be viewed in the light most favorable to the party opposing the motion. *Kidd v. Taos Ski Valley, Inc.*, 88 F.3d 848, 851 (10th Cir. 1996). However, conclusory statements and testimony based merely on conjecture or subjective belief are not competent summary judgment evidence. *Rice v. United States*, 166 F.3d

1088, 1092 (10th Cir. 1999), *cert. denied* 528 U.S. 933 (1999); *Nutting v. RAM Southwest, Inc.*, 106 F. Supp. 2d 1121, 1123 (D. Colo. 2000).

### D. ANALYSIS

**1. Title VII Claim**

Defendant believes three issues entitle it to summary judgment on Plaintiff's Title VII claim: (1) Defendant is not an employer within the meaning of Title VII because it does not employ the requisite number of employees; (2) Plaintiff is not an employee as defined under Title VII primarily because she fails the threshold-remuneration test; and, (3) the applicable statute of limitations has run. The Court will take these issues in turn.

**A. "Employer" Under Title VII**

To be liable for unlawful retaliatory conduct under Title VII, a defendant must meet the statutory definition of an "employer" for the year the discriminatory conduct took place, and the year prior. 42 U.S.C. § 2000e(b). Title VII defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." *Id.* In this case, Plaintiff may proceed to trial if she can demonstrate a genuine issue of fact as to whether Defendant employed 15 or more employees for more than 20 weeks per year in 2015 and 2016.

Defendant relies on its yearly earnings reports to argue that it did not employ the requisite number of employees during the applicable period. Plaintiff argues Defendant meets the threshold number of employees for two reasons: (1) Defendant is an integrated enterprise with the Pittsburgh Renaissance Festival, and the two festivals combined have

the requisite number of employees; and, (2) Defendant employed the requisite number of employees even without considering the Pittsburgh Renaissance Festival.

In its Reply, Defendant stated that "if this Court finds the evidence presented by the Plaintiff on this issue to be competent and not speculative, [Defendant] would concede that genuine issues of material fact make summary judgment on this issue improper." The Court does find the evidence presented by Plaintiff on this issue to be competent and not speculative. For example, there is no dispute that: Paradise also owns the limited liability company that operates the Pittsburgh Renaissance Festival; the Colorado and Pittsburgh Festivals share a payroll software license, website and ticket design, employment and crafter applications, and vehicles; and, at times, the Colorado Crafter Coordinator hires the Pittsburgh crafters. Thus, a reasonable jury could determine that the Pittsburgh Renaissance Festival is an integrated enterprise with the Colorado Renaissance Festival such that the combined enterprises satisfy the requisite number of employees. Plaintiff has similarly produced sufficient competent evidence from which a reasonable jury could decide that Defendant has the requisite number of employees even without considering Pittsburgh. The jury will determine this issue. *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1225 (10th Cir. 2014) (citing *Bristol v. Bd. of Cnty. Comm'rs.*, 312 F.3d 1213, 1221 (10th Cir. 2002) (whether two separate entities are an employer under the law is "a fact issue for the jury")).

**B. "Employee" Under Title VII**

The issue of whether there are disputed issues of material fact regarding Plaintiff's status as an employee under Title VII is a much closer call. Title VII defines "employee"

9

as an "individual employed by an employer." 42 U.S.C. § 2000e(f). The Tenth Circuit adopted a "hybrid test" to determine whether a worker is an "employee" within the meaning of Title VII. *Zinn v. McKune*, 143 F.3d 1353, 1357 (10th Cir. 1998). Generally, the focus of the test is to determine whether a plaintiff is an employee or an independent contractor. *Lambertsen v. Utah Dept. of Corr.*, 79 F.3d 1024, 1028 n.1 (10th Cir. 1996). Under the hybrid test, the "main focus of the court's inquiry is the employer's right to control the 'means and manner' of the worker's performance." *Id.* (citations omitted). The hybrid test also looks to other factors, including:

> (1) the kind of occupation at issue, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the employer or the employee furnishes the equipment used and the place of work; (4) the length of time the individual has worked; (5) the method of payment, whether by time or by job; (6) the manner in which the work relationship is terminated; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the employer; (9) whether the worker accumulates retirement benefits; (10) whether the employer pays social security taxes; and (11) the intention of the parties.

*Id.*; *see also Sizova v. Nat. Inst. of Standards & Tech.*, 282 F.3d 1320, 1328 (10th Cir. 2002). No single factor is determinative; rather, courts look to the totality of circumstances surrounding the working relationship between the parties. *Lambertsen*, 79 F.3d at 1028.

It is undisputed Defendant did not pay Plaintiff any direct compensation, such as an hourly wage, salary, or commission. As a result, Defendant emphasizes application of the "threshold-remuneration test." Courts in the Tenth Circuit typically rely on the hybrid test, however, when a person is unpaid courts look to whether the person receives sufficient remuneration to proceed to the hybrid test. *Sacchi v. IHC Health Servs.*, 918 F.3d 1155, 1158 (10th Cir. 2019).

10

Plaintiff argues that even under the threshold-remuneration test, Plaintiff receives ample direct and indirect benefits which make her a Title VII employee. Plaintiff argues, in part, that Defendant is "the ultimate source of Plaintiff's income because it controls her access to her customers, making that income direct compensation [and] [i]n any event, Plaintiff also satisfies the indirect benefits prong because income from sources controlled or delimited by an employer is a substantial indirect benefit." *See, e.g., Johnston v. Ellicot Fire Prot. Dist.*, No. 16-CV-00308-CMA-KLM, 2016 U.S. Dist. Lexis 171408, at *10 (D. Colo. Dec. 12, 2016) (indirect benefits are things of significant monetary value that are "not merely incidental to the volunteer activity").

Here, Plaintiff has cited enough competent evidence to raise a genuine issue of material fact on the threshold issue of remuneration, and the measure of control exerted by Defendant over Plaintiff's work. While the Court remains skeptical of the direct and indirect remuneration argued by Plaintiff,[5] the line of cases Plaintiff cites concerning exotic dancers whom also were not paid wages but were nevertheless found to be employees (albeit under the Fair Labor Standards Act (FLSA) as opposed to Title VII) of their clubs suggest a triable issue of fact for the jury. *See Mason v. Fantasy, LLC*, No. 13-cv-02020-RM-KLM, 2015 U.S. Dist. Lexis 97640, at *37 (D. Colo. July 27, 2015) (exotic dancers were employees under the FLSA's similar economic-realities test and despite being paid no wages); *Clincy v. Galardi S. Enters., Inc.*, 808 F. Supp. 2d 1326, 1343 (N.D. Ga. 2011) (collecting similar cases); *see also Nichols v. Hurley*, 921 F.2d 1101, 1103 (10th Cir.1990)

---

[5] The Court's skepticism is bolstered by the Independent Contractor provision in the Space Lease Agreement, and Plaintiff's under-oath representation in her EEOC charge that she "subcontracted" with Defendant.

11

(the definition of "employee" under the FLSA is "essentially identical" to that under Title VII).

A reasonable jury could determine that Defendant's control over patrons' access to Plaintiff may be sufficient direct or indirect remuneration to satisfy the threshold-remuneration test, along with other possible indirect benefits conveyed through the Rules. *See Haavistola v. Cmty. Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 222-23 (4th Cir. 1993) (it was a fact issue precluding summary judgment against former volunteer firefighter on her Title VII claim as to whether she received sufficient compensation to be considered an employee where she received no direct compensation but received other benefits). This is in addition to the employment-relationship a reasonable jury could conclude exists based on the level of control Defendant exercised over Plaintiff's work, as evidenced by the Rules. As mentioned above, the Rules controlled a plethora of matters and details involving Plaintiff's performance of her work. For these reasons, Plaintiff has produced sufficient competent evidence to show disputed issues of material fact over her employment status under both the threshold-remuneration test and the hybrid test.

### C. Statute of Limitations Under Title VII

Title VII requires a claimant to exhaust her administrative remedies by filing a timely charge of discrimination with the EEOC before filing a federal lawsuit. 42 U.S.C. § 2000e-5(e)(1). A charge of discrimination must be filed within 300 days "after the alleged lawful employment practice occurred." *Id.* A claimant bears the burden as the party seeking federal jurisdiction to show, by competent evidence, that she exhausted her administrative remedies. *McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1106 (10th

Cir. 2002). The Court finds that disputed issues of material fact abound regarding whether Plaintiff timely filed her charge of discrimination, and thus, whether the Court has jurisdiction.

Based on the date Plaintiff filed her charge of discrimination on August 2, 2016, it is undisputed that the last alleged unlawful employment practice must have occurred on or after October 7, 2015. Plaintiff has cited sufficient competent evidence to establish that: she worked as a tarot card reader at the Festival for over 30 years; she never received any written complaints about her booth, her appearance, her interactions with patrons, or anything else; her personality did not change in any meaningful way over the years; and, Paradise sometimes allowed people, including long-time Exhibitors, to sign leases as late as June of the applicable season, and thus, the fact that a previous Exhibitor did not have a lease signed until right before the start of the festival did not mean they would not be able to participate. Paradise wrote Plaintiff as late as January 2016 (and possibly in response to her December 2015 letter inquiring about renewal of her lease) directing her to remove her booth. As late as March 2016, Plaintiff received confirmation that Defendant would not entertain alternative options to allow her to return for 2016.

These undisputed facts suggest that based on Paradise's confessed looseness in allowing certain Exhibitors to sign last-minute deals, from the evidence that Walker was "edging to get [Plaintiff] out" [ECF. #147-10, at p.189], Paradise's notice to Plaintiff in January 2016, and the confirmation Plaintiff received in March 2016, a reasonable jury could determine that Defendant's alleged act of retaliation (by failing to offer Plaintiff a

new lease) did not occur or was not ripe until March 2016.[6] *Almond v. Unified Sch. Dist. #501*, 665 F.3d 1174, 1177 (10th Cir. 2011) (when an employee does not learn of an adverse act immediately, "courts revert to asking when the plaintiff did [know] or a reasonable employee would have known of the employer's decision"). Based on these disputed facts, this issue must be determined by the jury.

**2.    Breach of Contract Claim**

The elements of breach of contract are the existence of a contract, performance by the claimant or some justification for nonperformance, failure to perform by the defendant, and resulting damages to the claimant. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). Plaintiff claims Defendant breached the Space Lease Agreement in three ways: (1) by failing to renew the agreement for the 2016 season; (2) by removing or destroying her booth; and, (3) by failing to provide Plaintiff with progressive discipline required by the Rules. Plaintiff argues the Space Lease Agreement is ambiguous with respect to its term and Plaintiff's property rights, and that its silence with respect to renewal creates an additional ambiguity, thus entitling the jury to determine the agreement's meaning. The Court disagrees.

Contract interpretation is a matter of law for the Court in the absence of an ambiguity in the contract. *Ad Two, Inc. v. City & Cty. of Denver ex rel. Manager of Aviation*, 9 P.3d 373, 376 (Colo. 2000). Contract interpretation may become an issue of fact, rather

---

[6] This conclusion holds true even when considering the Space Lease Agreement's expiration at the end of its term. A reasonable jury could determine that notwithstanding the agreement ending at the conclusion of its term, Plaintiff could have reasonably believed into March 2016 that she would be offered a new agreement but-for the alleged retaliation.

than law, only if the court determines that a particular contract provision is ambiguous. *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 912 (Colo. 1996). The primary goal of contract interpretation is to determine the intent of the parties. *Ad Two*, 9 P.3d at 376. The intent of the parties to a contract is determined primarily from the language of the contract itself. *Id.* "Written contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language." *Id.* A contract is ambiguous if it is susceptible on its face to more than one reasonable interpretation, and absent an ambiguity, the court cannot look beyond the four corners of the document to determine the meaning intended by the parties. *USAA Cas. Ins. Co. v. Anglum*, 119 P.3d 1058, 1059-60 (Colo. 2005); *Ad Two*, 9 P.3d at 376-77.

Plaintiff argues there are numerous, ambiguous contractual provisions precluding summary judgment. She goes so far as to pose a series of rhetorical questions seemingly based on language in the Space Lease Agreement to argue ambiguity, to wit:

> How can a lease only be in effect for the two months of the festival, yet require the lessee to grant the Company a right to use the leased space during non-festival periods if the lessee does not have a continuing property interest? How can the Company give a notice to remove property prior to the term of the Lease if the property rights aren't perpetual? If the Company issues a notice to remove lessee's property and then gives lessee another space, what happens to lessee's personal property? How can the Company give notice of removal for the time period "prior" to the lease? Why does the agreement say that upon termination, notice will issue to remove property and in the same paragraph, state if the agreement is terminated, no notice is required?

[ECF. #146, at p.21.]

Plaintiff's approach is a stretch. "Courts have aptly characterized efforts to create ambiguity as 'something only a lawyer's ingenuity' could achieve . . . and as a 'strain'

15

upon 'logic.' The common-sense meaning of simple terms should not be contorted into a vehicle for reaching a planned destination." *U.S. Fid. & Guar. Co. v. Morrison Grain Co.*, 734 F. Supp. 437, 446 (D. Kan. 1990) (internal citations omitted), *aff'g* 999 F.2d 489 (10th Cir. 1993). "An ambiguity in a contract does not arise unless there is genuine uncertainty as to which of two or more meanings is proper; where in common sense, the court will not strain to create ambiguity." *Fairfax Portfolio, LLC v. Owens Corning Insulating Sys., LLC*, 509 Fed. App'x 822, 827 (10th Cir. 2013).

The Court finds no ambiguity in the Space Lease Agreement as concerns the breaches Plaintiff claims. Regarding renewal, Section 4 of the Space Lease Agreement unambiguously sets forth a defined term for its existence—from 1:00 p.m. the day before the commencement of the Festival Period, to 1:00 p.m. the day following the end of the Festival Period. Its silence concerning renewal is not an ambiguity; it merely indicates the agreement did not contemplate a contractual guarantee of renewal, automatic or otherwise. *See Newflower Mkt., Inc. v. Cook*, 229 P.3d 1058, 1064 (Colo. App. 2010) (refusing to consent to deposit money into specific account or negotiate for same when contract did not contemplate either action not a breach).

Regarding removal of Plaintiff's booth, Section 7 of the Space Lease Agreement unambiguously provides that Plaintiff could only construct a "temporary structure" on the site; that the structure would be considered "personal property;" and, Plaintiff would have to "remove all personal property (including any structure)" within five days after receiving a notice to remove the personal property (unless allowed to relocate the personal property

or unless Defendant terminated the agreement).[7] Section 7 goes on to address the disposition of personal property at the end of the agreement's term. In this regard, it provides that "if any personal property remains on Leased Space for a period of six months after the end of the term of this lease, then such personal property *shall be automatically assigned to and become the property of [Defendant], and may, at [Defendant's] option, be removed* . . . ." [ECF. #143-1 at p. 10 (emphasis added).]

There is no ambiguity in this language. It clearly provides that when the term of the Space Lease Agreement ended on August 3, 2015, Plaintiff had six months to remove her booth, otherwise ownership of the structure was automatically assigned to Defendant who could then remove it from the site. It is undisputed Plaintiff did not remove her booth within six months after the end of Space Lease Agreement's term, and Defendant removed her booth after the six-month period, as was its contractual right. *Fairfax Portfolio, LLC*, 509 Fed. App'x at 827 ("[T]he court will not strain to create ambiguity.").

Lastly, Plaintiff argues that even if the Court finds no ambiguities in the Space Lease Agreement, there was a clear breach precluding summary judgment based on Defendant's failure to provide Plaintiff with progressive discipline required by the Rules. The Court disagrees. The Regulation's progressive discipline section applies only to *infractions* of the Rules. [ECF. #147-9 at p. 9.] Here, there is no evidence Defendant terminated the Space Lease Agreement due to Plaintiff's infraction of the Rules. Instead,

---

[7] This provision does not require notice prior to removing a structure if the structure is removed due to expiration of the contractual term.

17

the undisputed evidence is that Defendant allowed the term of the Space Lease Agreement to expire, and thus, the agreement ended based on the expiration of its term.[8]

For these reasons, and based on the record of undisputed material facts, no reasonable jury could find a breach of the Space Lease Agreement. Thus, Defendant is entitled to judgment as a matter of law on the breach of contract claim.

3.      **Claim for Breach of the Duty of Good Faith and Fair Dealing**

"Colorado, like the majority of jurisdictions, recognizes that every contract contains an implied duty of good faith and fair dealing." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995), *as modified on denial of reh'g* (Jan. 16, 1996). This duty "applies when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time. The covenant may be relied upon *only* when the manner of performance under a specific contract term allows for discretion on the part of either party." *Id.* (internal citations omitted) (emphasis added).

Here, Plaintiff has failed to identify any specific contractual provision according Defendant discretion. She merely argues generally that the Space Lease Agreement affords Defendant "unchecked discretion." [*See generally* ECF. #146; *id.* at p.19.] The Court finds no discretionary provisions which would preclude summary judgment in Defendant's favor, especially where the Court has already determined that no reasonable jury could find that Defendant breached the Space Lease Agreement. For these reasons,

---

[8] This finding applies regardless of the reasons Paradise offered in his deposition for not asking Plaintiff back. There is no evidence in the record that Paradise affirmatively terminated the Space Lease Agreement, let alone terminated the agreement due to violations of the Rules by Plaintiff.

18

Defendant is entitled to judgment as a matter of law on Plaintiff's claim for breach of the duty of good faith and fair dealing.

## E. CONCLUSION

Defendant's Motion for Summary Judgment is DENIED regarding Plaintiff's Title VII claim (First Claim for Relief). It is GRANTED regarding Plaintiff's breach of contract claim (Third Claim for Relief) and the claim for breach of implied covenant of good faith and fair dealing (Fourth Claim for Relief). Judgement shall enter against Plaintiff, and in favor of Defendant, on the Third and Fourth Claims for Relief. The First Claim for Relief will proceed to trial.

DATED: July 10, 2019

BY THE COURT:

_____

S. Kato Crews
U.S. Magistrate Judge